IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TUAN SAMAHON                     :      CIVIL ACTION
                                 :      NO. 12-4839
          Plaintiff,             :
                                 :
     v.                          :
                                 :
FEDERAL BUREAU OF INVESTIGATION, :
et al.,                          :
                                 :
          Defendants.            :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                         August 25, 2014


     This is a case about abuse of governmental power by
senior officials in the federal government. Although technically
framed as a request for disclosure of certain information in the
files of the Federal Bureau of Investigation ("FBI") pursuant to
the Freedom of Information Act ("FOIA"), at bottom, the case is
about the ability of the federal government to pry into the
private lives of U.S. citizens with virtual impunity.

     The case implicates the highest levels of the federal
government, including President Lyndon B. Johnson, Associate
Justice of the Supreme Court Abe Fortas, and senior FBI
officials including FBI Director J. Edgar Hoover. The subject of
the government's interest was George Hamilton, a film and
television actor who at the time (circa 1966) was dating Lynda
Bird Johnson, the President's oldest daughter.

It appears that either out of fatherly worry or fears of political embarrassment, President Johnson was concerned with the relationship. This concern led him to involve both the FBI and Associate Justice Abe Fortas in a "discreet investigation" of George Hamilton's personal life. The facts of this inquiry conducted by FBI agents are enshrined in the records of the FBI and lie at the center of this case. Ultimately, the inquiry uncovered little, if any, negative information about George Hamilton, but it reveals much about the ways and means of the government's investigation of private citizens in the 1960s.

This memorandum opinion proceeds in four parts. First, the opinion discusses the procedural and factual background of the case. Second, it delineates the general principles of the FOIA that govern the Court's analysis. Third, it examines the factual submissions provided to the Court by the FBI. Finally, it applies the law to those facts to determine whether the FBI properly withheld the requested information. For the reasons explained herein, the Court concludes that the FBI's denial of Plaintiff's requests was in violation of the broad disclosure requirements set forth in the FOIA.

## I.   BACKGROUND

Plaintiff Tuan Samahon ("Plaintiff") is a professor of law at Villanova Law School who is researching the 1969

resignation of Associate Justice Abe Fortas from the United States Supreme Court. Compl. ¶ 1, ECF No. 1. Specifically, Plaintiff is focusing on the potential role that the FBI, under the direction of former FBI Director J. Edgar Hoover, had in Justice Fortas's resignation.

As part of that research, Plaintiff submitted a FOIA request to the FBI on January 4, 2010, requesting disclosure of a copy of an internal FBI memorandum referred to as the "DeLoach Memorandum." Compl. ¶ 6. The DeLoach Memorandum is a two-page document dated October 25, 1966, that was sent by then-Deputy FBI Director Cartha DeLoach to Clyde Tolson, the Associate Director of the FBI at the time. Compl. ¶ 7 & Ex. 1, DeLoach Memo 1. In response to the FOIA request, the FBI provided a copy of the DeLoach Memorandum to Plaintiff, but redacted from the document two fifteen-character segments (hereinafter referred to as the "Redacted Memorandum").[1] Compl. ¶ 8 & DeLoach Mem. 1. According to the FBI's representations to Plaintiff, those two redactions contain the name of a living individual. Compl. ¶¶ 10, 38.

As is apparent even with the redactions, the subject of the DeLoach Memorandum is a telephone conversation DeLoach had

---

[1]     A previous FOIA requester had obtained an identically redacted version of the DeLoach Memorandum. Ex. to Defs.' Mot. Summ. J., 1st Hardy Decl. Ex. A, FOIA Request, Jan. 1, 2010, ECF No. 10.

with Justice Fortas on the morning of October 25, 1966. The
first redaction occurs in the subject line of the memo, which
states: "RE: CONVERSATION WITH JUSTICE FORTAS – [REDACTED]
MATTER; BLACK CASE." DeLoach Mem. 1. The second redaction is in
the first paragraph of the document, which reads as follows:

> For record purposes, Justice Fortas called
> at 10:30 this morning to express
> appreciation for the information the
> Director had me furnish him concerning
> [REDACTED] matter. Justice Fortas advised he
> agreed with the Director that no further
> action need be taken at this time. He stated
> he would get in touch with us in the event
> further inquiries should be made.

Id.

The DeLoach Memorandum then describes DeLoach's ex parte
discussion with Justice Fortas regarding the matter of Black v.
United States, 385 U.S. 26 (1966), a case that was pending
before the Supreme Court at the time. DeLoach Mem. 1. The Black
case involved the use of federal wiretapping and electronic
surveillance investigative techniques, Compl. ¶ 13, and DeLoach
indicated to Justice Fortas that the FBI was "somewhat
concerned" with the case's potential outcome, DeLoach Mem. 1.
According to the DeLoach Memorandum, DeLoach asked Justice
Fortas "when a decision would be handed down." Id. Justice
Fortas had recused himself from the case, but he indicated to
DeLoach that there would probably be a decision in a week, and
he advised DeLoach that the Court's decision "would not be

definitive" and that the Court thought the case "should not be handled at [the] Supreme Court level." Id.; see also Compl. ¶ 15. DeLoach interpreted that statement to mean that the case would be remanded to the lower court. DeLoach Mem. 1. The Memorandum concludes by stating: "Pursuant to the Director's instructions, we are immediately checking to find out the identity of the judge who handled this matter in the lower court. A memorandum will be sent through on him just as soon as his identity is ascertained." Id. Finally, the DeLoach Memorandum includes an "addendum" asserting that Justice Fortas did not act improperly or violate ethical requirements by divulging information about the Black case.[2] Id. at 2. A copy of the Redacted Memorandum is attached to this memorandum as "Exhibit A."

Based on his previous research on Justice Fortas and the Hoover FBI, Plaintiff theorizes that the DeLoach Memorandum reflects an effort by the FBI to blackmail Justice Fortas into providing improper information about the Supreme Court's handling of the Black case. Pl.'s Cross-Mot. Summ. J. 30, ECF

---

[2]     According to Plaintiff, DeLoach contradicted that portrayal of Justice Fortas's actions in a memoir DeLoach published in 1995, in which he states: "Of course Fortas's involvement in [leaking information about Black v. United States] was blatantly unethical." Compl. ¶ 18 (quoting Cartha DeLoach, Hoover's FBI: The Inside Story by Hoover's Trusted Lieutenant 58 (1995)) (alterations and emphasis in Complaint).

No. 13. Specifically, Plaintiff speculates that the redacted name is a person with whom Justice Fortas had some sort of illicit or improper relationship, and that DeLoach used the FBI's knowledge of that relationship to intimidate Justice Fortas into unethically disclosing details about the <u>Black</u> case. <u>See</u> <u>id.</u> at 30-33. Plaintiff supports that theory with various forms of historical evidence, including a documented encounter between Justice Fortas and DeLoach in which DeLoach shared with Fortas an allegation that Fortas had engaged in sexual acts with a male prostitute at a time before his nomination to the Supreme Court. <u>Id.</u>; <u>see also</u> Compl. Ex. 2, Tolson Letter, July 24, 1967.

On August 22, 2012, after exhausting his administrative remedies, Plaintiff filed the original complaint in the instant litigation (the "Original Complaint") against the FBI and the U.S. Department of Justice (collectively, "the Government"), in which Plaintiff asserts that the FBI's redaction of the DeLoach Memorandum was in violation of the FOIA and of the Administrative Procedure Act ("APA"). The parties filed cross-motions for summary judgment and, on August 27, 2013, the Court denied the motions without prejudice, finding there to be insufficient evidence in the record for the Court to determine whether any of the FOIA's exemptions to disclosure apply. <u>See</u> Defs.' Mot. Summ. J. 1, ECF No. 9; Pl.'s Cross-Mot. Summ. J. 1; Order, Aug. 27, 2013, ECF No. 17. The parties subsequently filed

6

supplemental motions for summary judgment, which are ripe for
resolution. See Defs.' Suppl. Mot. Summ. J. 1, ECF No. 23; Pl.'s
Renewed Mot. Summ. J., ECF No. 27.

Then, with the supplemental motions still pending,
Plaintiff was granted leave to file a supplemental complaint
regarding an additional alleged FOIA violation that arose during
the course of the litigation (the "Supplemental Complaint").
Suppl. Compl., ECF No. 30. The Supplemental Complaint addresses
the FBI's handling of a second FOIA request filed by Plaintiff
on October 19, 2012. That FOIA request sought the contents of
"FBI File No. 62-HQ-110654," which is the file in which the
DeLoach Memorandum is located, and, according to the FBI, is the
background check file for the individual whose name is redacted
from the DeLoach Memorandum. The FBI acknowledged receipt of
Plaintiff's FOIA request by letter dated October 24, 2012, but
it did not otherwise respond to the request until Plaintiff
filed the Supplemental Complaint, at which point the FBI
categorically withheld the file by letter dated December 9,
2013. See Pl.'s Mot. Leave File Suppl. Compl. Ex. B., Request
Confirmation, Oct. 24, 2012, ECF No. 21-2; Pl.'s Mot. Leave File
2nd Suppl. Compl. Ex. 1, FOIA Denial Letter, Dec. 9, 2013, ECF
No. 36. The Court then granted Plaintiff leave to add a second
FOIA claim to the Supplemental Complaint based upon the
Government's alleged failure to release reasonably segregable,

nonexempt material from the requested file. See Order, Jan. 28, 2014, ECF No. 37. The parties have filed cross-motions for summary judgment on the claims in the Supplemental Complaint, and those motions are also now ripe for resolution. See Defs.' 2nd Suppl. Mot. Summ. J. 1, ECF No. 35; Pl.'s 3rd Mot. Summ. J. 1, ECF No. 38.

In an effort to resolve the pending sets of cross-motions for summary judgment, the Court ordered the Government to submit an unredacted version of the DeLoach Memorandum for in camera review. Order, Apr. 23, 2014, ECF No. 41. The Court further requested a supplemental affidavit and document index describing more precisely the basis for withholding the documents that are the subject of the second FOIA request. Id. After reviewing those submissions, the Court also ordered an in camera review of FBI File No. 62-HQ-110654 (hereinafter, the "Withheld File"), as well as a response from Plaintiff to the Government's supplemental submissions. Order, May 29, 2014, ECF No. 48. Finally, the Court ordered an ex parte hearing with counsel for the Government, which was held on June 27, 2014. Order, June 19, 2014, ECF No. 51. In advance of the hearing, Plaintiff submitted proposed questions for the Court to ask the Government, which the Court took under advisement. Pl.'s Statement, June 26, 2014, ECF No. 52. The entire matter is now ripe for disposition.

## II.  THE FREEDOM OF INFORMATION ACT

Under the FOIA, "any agency, upon any request," must "make records promptly available to any person." Am. Civil Liberties Union of N.J. v. FBI, 733 F.3d 526, 531 (3d Cir. 2013) (quoting 5 U.S.C. § 552(a)(3)(A)) (internal quotation marks omitted). The purpose of the statute is "to facilitate public access to Government documents," and the statute reflects "a general philosophy of full agency disclosure." Manna v. U.S. Dep't of Justice, 51 F.3d 1158, 1163 (3d Cir. 1995) (internal quotation marks omitted); see also U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991) ("The statute was designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976))). As such, there is a "strong presumption in favor of disclosure." Ray, 502 U.S. at 173.

But despite the strong presumption in favor of disclosure, public access to government information is not "all encompassing." Sheet Metal Workers Int'l Ass'n, Local Union No. 19 v. U.S. Dep't of Veterans Affairs, 135 F.3d 891, 897 (3d Cir. 1998) (internal quotation marks omitted). In particular, the FOIA exempts nine categories of documents from its broad disclosure requirements. See 5 U.S.C. § 552(b); U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989). Most relevant here are Exemptions 6 and 7(C),

9

which are described in depth below. Put simply, Exemption 6
exempts from disclosure "personnel and medical files and similar
files the disclosure of which would constitute a clearly
unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).
Exemption 7(C) "excludes records or information compiled for law
enforcement purposes, 'but only to the extent that the
production of such [materials] . . . could reasonably be
expected to constitute an unwarranted invasion of personal
privacy.'" Reporters Comm., 489 U.S. at 756 (quoting §
552(b)(7)(C)) (alterations in original). Once triggered, both
exemptions require courts to "balance the public interest in
disclosure against the interest Congress intended the exemption
to protect." U.S. Dep't of Defense v. Fed. Labor Relations
Auth., 510 U.S. 487, 495 (1994) (alteration omitted).

When assessing whether a record is covered by one of
those exemptions, courts must keep in mind that "whether an
invasion of privacy is warranted cannot turn on the purposes for
which the request for information is made." Id. at 496 (quoting
Reporters Comm., 489 U.S. at 771) (emphasis omitted). As the
Supreme Court has repeatedly explained, "Congress 'clearly
intended' the FOIA 'to give any member of the public as much
right to disclosure as one with a special interest [in a
particular document].'" Reporters Comm., 489 U.S. at 771
(quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975))

10

(alteration in original). Therefore, except in cases involving a claim of privilege, "the identity of the requesting party has no bearing on the merits of his or her FOIA request." Id. The Supreme Court has further cautioned lower courts to remember "that once there is disclosure, the information belongs to the general public." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 174 (2004). "There is no mechanism under [the] FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination." Id.

Finally, because of the presumption favoring disclosure, judicial review of an agency decision to withhold records differs from review of other agency actions, which generally "must be upheld if supported by substantial evidence and not arbitrary or capricious." Reporters Comm., 489 U.S. at 755. The FOIA adopts a more rigorous form of judicial review, "expressly plac[ing] the burden 'on the agency to sustain its action' and direct[ing] the district courts to 'determine the matter de novo.'" Id. (quoting 5 U.S.C. § 552(a)(4)(B)). The Third Circuit has held that an agency can meet its burden "by filing affidavits describing the material withheld and detailing why it fits within the claimed exemption." Manna, 51 F.3d at 1163. If those affidavits "describe the withheld information and the justification for withholding with reasonable specificity,

11

demonstrating a logical connection between the information and the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," then the agency is generally entitled to summary judgment. Id. at 1163-64 (quoting Am. Friends Serv. Comm. v. Dep't of Defense, 831 F.3d 441, 444 (3d Cir. 1987)). If a district court determines that the agency's showing is inadequate to meet its burden, however, the court has jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

## III. FACTUAL BASIS FOR THE COURT'S ANALYSIS

Before evaluating whether an asserted exemption to disclosure applies, a district court must ensure that it has an "adequate factual basis" to make an informed determination. McDonnell v. United States, 4 F.3d 1227, 1242 (3d Cir. 1993). In most FOIA cases, there is an inherent imbalance in the litigation, as "the party seeking disclosure does not know the contents of the information sought," and so is "helpless to contradict the government's description of the information or effectively assist the trial judge." Davin v. U.S. Dep't of Justice, 60 F.3d 1043, 1049 (3d Cir. 1995). To correct that

"asymmetrical distribution of knowledge," courts generally require the agency to submit public affidavits, often referred to as a Vaughn index,[3] that "establish a detailed factual basis for application of the claimed FOIA exemptions to each of the documents withheld." Id. at 1049-50. Ideally, such public affidavits will "'permit adequate adversary testing of the agency's claimed right to an exemption,' and enable 'the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves." McDonnell, 4 F.3d at 1241 (quoting King v. U.S. Dep't of Justice, 830 F.2d 210, 219 (D.C. Cir. 1987)).

If the public affidavits prove insufficient for the court to make a reasoned determination, however, the FOIA grants district courts the authority to order in camera inspection of agency records. 5 U.S.C. § 552(a)(4)(B) (providing that the court "may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld"); see also Lame v. U.S. Dep't of Justice, 654 F.2d 917, 922 (3d Cir. 1981) ("In both the ordinary and the exceptional case, in camera affidavits and submissions are

---

[3]       The Third Circuit has defined a "Vaughn index" as "an index correlating each withheld document, or a portion thereof, with a specific exemption and relevant part of an agency's justification for nondisclosure." Davin, 60 F.3d at 1047 n.1. The concept of a Vaughn index originated with the D.C. Circuit's decision in Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

authorized and the district court may resort to them in arriving at its ultimate determination."). The court may also proceed ex parte to the extent necessary to protect against unintended disclosure of withheld information. Long v. IRS, 742 F.2d 1173, 1182 (9th Cir. 1984); see also Alexander v. FBI, 192 F.R.D. 37, 40 (D.D.C. 2000) (explaining that the circumstances required the court to "review[] the entire investigative file in camera, as well as conduct[] an ex parte, in camera hearing with the government regarding the applicability of the law enforcement privilege to [the] documents").

In this case, the FBI has submitted as its Vaughn index several declarations of David M. Hardy, the FBI Section Chief of the Record/Information Dissemination Section, Records Management Division (the "Hardy Declarations"). Because of the unique factual circumstances of this case, described below, those declarations proved insufficient to enable the Court to make a determination as to whether the documents were properly withheld, and so the Court also ordered an in camera review of the documents and held an ex parte hearing[4] with counsel for the Government regarding the basis for the asserted exemptions. The

---

[4]    The ex parte hearing was held on the record and the proceeding was placed under seal. Plaintiff was notified as to when the hearing would take place, and he submitted proposed questions for the Court to consider asking of counsel. Plaintiff did not object to the ex parte nature of the hearing.

information revealed through both the public disclosures and the
in camera review is described below.

A.      Public Declarations

        The FBI submitted a total of four Hardy Declarations that
describe the factual and legal bases for asserting the relevant
FOIA exemptions. The first declaration, dated November 14, 2012,
was submitted as an exhibit to the Government's initial motion
for summary judgment, and it addresses the redactions in the
DeLoach Memorandum. Ex. to Defs.' Mot. Summ. J., 1st Hardy
Decl., ECF No. 10. The second declaration, dated September 26,
2013, was submitted along with a supplemental motion for summary
judgment in response to the Court's order denying the initial
set of cross-motions without prejudice and requesting further
explanation from the government. Ex. to Defs.' Suppl. Mot. Summ.
J., 2nd Hardy Decl., ECF No. 23. That declaration again
addresses the Redacted Memorandum. The third declaration, dated
December 16, 2013 (and inaccurately labeled the "Second
Declaration of David M. Hardy"), was submitted as an exhibit to
the Government's motion for summary judgment on the claims in
the Supplemental Complaint. Ex. to Defs.' 2nd Suppl. Mot. Summ.
J., 3rd Hardy Decl., ECF No. 35. Although it ostensibly
addresses the bases for withholding FBI File No. 62-HQ-110654,
it is almost identical to the second declaration, which perhaps
explains the mislabeling of the document. Finally, the fourth

declaration, dated May 23, 2014, was submitted in response to the Court's order requesting a "supplemental Vaughn Index that describes each of the withheld documents in FBI File Number 62-HQ-110654 and provides a particularized description of how each document falls within a statutory exemption." Order, Apr. 23, 2014, ECF No. 48. It describes more precisely the bases for categorically withholding the Withheld File and includes an index of the withheld documents. 4th Hardy Decl., May 23, 2014.

The Hardy Declarations can be more concisely summarized as follows:

| | Date Submitted | Subject | Exemptions Asserted |
|---|---|---|---|
| **First Declaration** | November 14, 2012 | The Redacted Memorandum | Exemption 6 Exemption 7(C) |
| **Second Declaration** | September 26, 2013 | The Redacted Memorandum | Exemption 6 Exemption 7(C) |
| **Third Declaration** | December 16, 2013 | The Redacted Memorandum and the Withheld File | Exemption 6 Exemption 7(C) |
| **Fourth Declaration** | May 23, 2014 | The Withheld File | Exemption 6 Exemption 7(C) Exemption 7(D)[5] |

Despite those numerous submissions, however, the FBI provided the Court with few factual details regarding the bases for the redactions and the subject matter of the Withheld File. Indeed, the Government acknowledged as much during the ex parte hearing, explaining that the FBI worried that publicly

---

[5]      Exception 7(D) exempts from disclosure records compiled for law enforcement purposes that "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D).

16

disclosing even small amounts of information could result in improper disclosure of protected information. See Tr. Ex Parte Hr'g 19. Nonetheless, the FBI did provide the following relevant factual details in the first three Hardy Declarations:

- The redactions in the DeLoach Memorandum contain the name of a person who is not deceased. 1st Hardy Decl. ¶ 18.

- That person was the subject of a "background and security investigation" conducted by the FBI "at the request of the White House" to "assist in the protection" of President Lyndon B. Johnson. 2nd Hardy Decl. ¶ 8.

- The individual under investigation "was not a government official, but was someone who could reasonably be expected to have access to locales in close proximity to or frequented by the President." Id.

- The individual under investigation "is not associated with the Black case," and the two matters are unrelated topics in the DeLoach Memorandum. Id. ¶ 11.

- The Withheld File was opened for the purpose of conducting the background investigation on the individual whose name is redacted from the DeLoach Memorandum. Id. ¶¶ 7-8.

In the fourth Hardy Declaration, the FBI describes in more depth the documents contained in the Withheld File and the privacy interests potentially implicated by disclosure. The agency still relies primarily on generic descriptions, however, explaining the overarching policy reasons for not disclosing identifying information about various third parties, including FBI Special Agents, support personnel, government employees, law

17

enforcement officers, sources of information, and persons of investigative interest. 4th Hardy Decl. ¶¶ 12-19. The declaration also emphasizes the need to protect all data and identifying information regarding confidential sources. Id. ¶¶ 20-32.

Finally, the fourth Hardy Declaration includes a formal Vaughn index, which describes each of the documents contained in the Withheld File. But the descriptions in the index are again generic, providing only the date of each document, its general type, and the overall nature of the privacy interests at stake. For example, several of the documents in the file are described as follows:

> Internal Memorandum detailing information provided by an informant concerning background information on a third-party of investigative interest involving a White House matter. Third-party information, if disclosed, could reveal associates of the third-party and could be embarrassing to living individuals and/or their families, as well as an invasion of their personal privacy. Additionally, information provided by a source, if disclosed, could reveal the source's identity.

4th Hardy Decl. Ex. A, Vaughn Index, at 1.

Even when considered cumulatively, the facts publicly disclosed in the Hardy Declarations are insufficient to allow the Court to reach an informed conclusion as to whether the documents were properly withheld. It is unclear, for instance,

18

whether the referenced investigation was related to a
"legitimate law enforcement concern," as is required for
Exemption 7(C) to be implicated. See Abdelfattah v. U.S. Dep't
of Homeland Sec., 488 F.3d 178, 185 (3d Cir. 2007). Further,
without more information specific to the circumstances of this
case, it is impossible to assess the precise nature of the
particular privacy interests at stake or to consider the public
interest that might be served by disclosure. See Davin, 60 F.3d
at 1051 (rejecting as inadequate generic explanations that fail
to provide enough factual "connective tissue" to link "the
document, the deletion, the exemption, and the explanation").
Therefore, in order to conduct the requisite balancing test, the
Court ordered in camera review of relevant documents.

     B.    In Camera Submissions

     The Court reviewed in camera both an unredacted version
of the DeLoach Memorandum and the entire contents of the
Withheld File. The unredacted DeLoach Memorandum reveals the
individual named in the Memorandum to be George Hamilton, an
American film and television actor who was dating President
Johnson's daughter, Lynda Bird Johnson, at around the time the
DeLoach Memorandum was written. Thus, when read in full, the
DeLoach Memorandum indicates that Justice Fortas called FBI
Deputy Director Cartha DeLoach "to express appreciation for the
information" Hoover had DeLoach provide Fortas "concerning the

George Hamilton matter." Unredacted DeLoach Mem. 1. Justice

Fortas then advised DeLoach that "no further action" needed to

be taken at that time, and that Fortas would be in touch with

the FBI "in the event further inquiries should be made." Id.

Standing alone, those statements are quite ambiguous, but

they seem to suggest that "the George Hamilton matter" was a

subject of some concern to both the FBI and to Justice Fortas.

In particular, it seems that the FBI was providing Justice

Fortas with information about Hamilton, and that Fortas was

instructing the FBI on what actions it should take. Somewhat

suspicious on their own, those facts take on greater

significance when read in historical context. As discussed

above, it is well known (or, it was at the time, at least) that

George Hamilton was romantically involved with the President's

daughter at around the time the DeLoach Memorandum was written.

See, e.g., Roxanne Roberts & Amy Argetsinger, "Lynda Johnson

Robb and George Hamilton: When a President's Daughter Dated a

Movie Star," The Washington Post, Feb. 13, 2012,

http://www.washingtonpost.com/blogs/reliable-source/post/lynda-

johnson-robb-and-george-hamilton-when-a-presidents-daughter-

dated-a-movie-star/2012/02/10/gIQAuXZO9Q_blog.html (last visited

Aug. 15, 2014); see also Tr. Ex Parte Hr'g 5 (defense counsel:

"[A]n essential point here is that as the entire world knows,

George Hamilton was dating the President's older daughter."). It

is also well established that Justice Fortas and President
Johnson had a long-term close relationship. See, e.g., Laura
Kalman, Abe Fortas 202-07 (1990) (describing the relationship);
see also Tr. Ex Parte Hr'g 9 (defense counsel noting that "those
familiar with the politics of the 30s through the 60s" know that
"Justice Fortas was a longstanding friend and confidant of
Lyndon Johnson").[6] In light of those circumstances, it does not
require a tremendous inferential leap to conclude that the FBI
and Justice Fortas were likely discussing Hamilton due to
Johnson's personal (i.e., fatherly) interest in the actor.
Indeed, the Government acknowledged as much at the ex parte
hearing, stating that the FBI and Justice Fortas were discussing
"a parental interest on Johnson's behalf," and that it "should

---

[6]     For more information on the Johnson-Fortas
relationship, see Bruce Allen Murphy, Fortas: The Rise and Ruin
of a Supreme Court Justice (1988). According to Murphy, a 1968
Time magazine article correctly characterized the relationship
as follows: "Fortas is the true eminence grise of the Johnson
Administration. No one outside knows accurately how many times
Abe Fortas has come through the back door of the White House,
but any figure would probably be too low." Id. at 234. Murphy
writes that, by 1966, "the relationship between the president
and the advising justice had been set for the rest of Johnson's
time in office. There was nothing that could not be placed on
the Fortas agenda." Id. at 236; see also Robert A. Caro, The
Years of Lyndon Johnson: Means of Ascent 368-72 (1990)
(describing Fortas's role in Johnson's election to the U.S.
Senate in 1948); Neil D. McFeeley, Appointment of Judges: The
Johnson Presidency 33 (1987) (describing Fortas as a "longtime
confidante" of Johnson's who advised the President "on the
selection of federal judges until Johnson left office, even
while [Fortas was] himself serving as a justice of the Supreme
Court").

not come as a surprise" that "the White House had an interest in [Hamilton]." Tr. Ex Parte Hr'g 5-6.

Review of the Withheld File confirms that it documents an FBI investigation of George Hamilton's personal background. The focus of the investigation seems to be certain rumors that Lynda Bird Johnson, through her relationship with George Hamilton, was "running around with a bunch of homosexuals." Withheld File at Samahon-1. The documents contained in the file indicate that the FBI investigated various leads in an effort to uncover evidence that George Hamilton and/or his friends and family members were engaged in homosexual behavior. The investigation also explored other allegations of conduct considered to be illicit, illegal, or immoral at the time. For example, the FBI reviewed Hamilton's credit history, id. at Samahon-19, explored rumors that an individual close to him was "little more than a prostitute," id. at Samahon-36, and saved newspaper clippings describing the controversy over Hamilton's draft deferment status, id. at Samahon-84 to -86. Overall, as the Government acknowledged during the ex parte hearing, the contents of the file reveal that the FBI was essentially "digging up dirt" on George Hamilton at the request of President Johnson. See Tr. Ex Parte Hr'g 12-13.

Justice Fortas is mentioned just three times in the Withheld File. Two of these mentions appear in internal

memoranda from an FBI agent to DeLoach describing information
the investigation had uncovered. Both memoranda conclude by
recommending that "Justice Fortas be advised . . . of the above
information," which suggests that Justice Fortas played an
active role in the overall investigation beyond the conversation
memorialized in the DeLoach Memorandum. Withheld File at
Samahon-99, -101. The third mention of Justice Fortas appears in
the DeLoach Memorandum itself, which is part of the Withheld
File. Id. at Samahon-107 to -08. The Black case is not mentioned
in the file outside of the DeLoach Memorandum.

**IV.  DISCUSSION**

Based upon those facts, the Court must determine whether
the redaction of the DeLoach Memorandum and the withholding of
FBI File No. 62-HQ-110654 are appropriate under any of the FOIA
exemptions. Although the FBI asserts similar justifications for
both the redactions and the withholding of the file, the
analysis of each issue is somewhat different. Accordingly, the
Court will consider the two issues in turn, beginning with the
redaction of the fifteen-character name from the DeLoach
Memorandum.

A.   The Redacted Memorandum

The claims in Plaintiff's Original Complaint all arise
from the FBI's denial of Plaintiff's request for an unredacted
version of the DeLoach Memorandum. The Government asserts that

the redaction of the name is proper under Exemption 6, which
protects privacy interests generally, and under Exemption 7(C),
which protects information compiled for law enforcement
purposes. For each of those exemptions, the Court must determine
as a threshold matter whether the record at issue is the type of
record covered by the exemption. If it is, the Court then
balances the public interest in disclosure against the privacy
interests protected by the exemption. U.S. Dep't of Defense v.
Fed. Labor Relations Auth., 510 U.S. 487, 495 (1994). As is
explained in more depth below, the interests to be weighed in
that balancing test are the same under both Exemption 6 and
Exemption 7(C), but the two exemptions "differ in the magnitude
of the public interest that is required to override the
respective privacy interests protected by the exemptions." Id.
at 496 n.6.

     1.   Exemption 6

     Exemption 6 exempts from disclosure "personnel and
medical files and similar files the disclosure of which would
constitute a clearly unwarranted invasion of personal privacy."
5 U.S.C. § 552(b)(6). Thus, at the threshold, the Court must
determine if the name redacted from the DeLoach Memorandum is a
"personnel," "medical," or "similar" file. As it is clear that
the redacted name is not a personnel or medical file (and the
Government does not contend otherwise), the question is whether

the name can be considered a "similar" file that falls within
the scope of Exemption 6.

The Supreme Court discussed the scope of Exemption 6 at
length in U.S. Department of State v. Washington Post Co., 456
U.S. 595 (1982). In that decision, the Court rejected the
argument that the phrase "similar files" should be read as a
narrow addition to "personnel and medical files," instead
interpreting the phrase to have a "broad" meaning. Id. at 600.
Looking to the FOIA's legislative history, the Court explained
that the primary limit to the scope of the exemption is the
phrase "clearly unwarranted invasion of personal privacy" – that
is, the balancing test itself – not the references to particular
types of files. Id. at 599-600. Based upon that reading, the
Court concluded that Exemption 6 was "intended to cover detailed
Government records on an individual which can be identified as
applying to that individual." Id. at 602. Thus, whenever
"disclosure of information which applies to a particular
individual is sought from Government records," courts must
proceed to the balancing test and consider "whether release of
the information would constitute a clearly unwarranted invasion
of that person's privacy." Id.; see also U.S. Dep't of State v.
Ray, 502 U.S. 164, 173 (1991) (concluding that, because the
withheld information "unquestionably appl[ied] to . . .

25

particular individuals," it was a "'similar file[]' within the meaning of the exemption").

Based upon that precedent, the redacted name in the DeLoach Memorandum constitutes a "similar" file within the meaning of Exemption 6. Although Plaintiff suggests that the name might not be distinctive enough to be said to apply to a particular individual, he clearly hopes that it will be identifiable to a particular person, as only then might it lend credence to his blackmail theory. Moreover, the Court's in camera review reveals that the redaction is of the name of a well-known figure in popular culture. Given that fact, disclosure of the name reveals details about a specific person – it tells the reader that an identifiable individual was the subject of a conversation between Justice Fortas and FBI Deputy Director Cartha DeLoach. Thus, because the FBI has withheld information that "applies to a particular individual," the threshold inquiry of Exemption 6 is satisfied, and the Court must proceed to the balancing test. See Washington Post Co., 456 U.S. at 602.

The balancing test in Exemption 6 is weighted strongly in favor of disclosure, permitting an agency to withhold files only if disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Thus, to determine if the redactions are proper, the Court must: (1) identify the

nature of the privacy interests at stake; (2) determine if there
is a public interest served by disclosure; and (3) assess
whether the threat to privacy posed by disclosure is "clearly
unwarranted."

       a.   Privacy Interests

      Broadly speaking, the privacy interest considered most
relevant under the FOIA is "the individual interest in avoiding
disclosure of personal matters." U.S. Dep't of Justice v.
Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762
(1989). That privacy interest encompasses "the individual's
control of information concerning his or her person." Id. at
763. Put another way, the FOIA's privacy-related exemptions seek
to protect "[a]n individual's interest in controlling the
dissemination of information regarding personal matters." U.S.
Dep't of Defense, 510 U.S. at 500. The Court has emphasized,
however, that "[t]o say that the concept of personal privacy
must 'encompass' the individual's control of information about
himself does not mean it cannot encompass other personal privacy
interests as well." Nat'l Archives & Records Admin. v. Favish,
541 U.S. 157, 165 (2004). Overall, the privacy interests
protected under the FOIA should not be viewed in a "limited" or
"cramped" way, id., and they generally must be considered in
light of the particular facts at issue, see Davin v. U.S. Dep't
of Justice, 60 F.3d 1043, 1060 (3d Cir. 1995) (opting not to

adopt a "per se rule" regarding an individual's privacy interests).

When considering whether disclosure of certain information implicates privacy interests, courts are especially concerned with information that could be considered sensitive, derogatory, or intimate. In particular, both the Supreme Court and the Third Circuit have been highly protective of information that links a private individual to a criminal or national security investigation. See Favish, 541 U.S. at 166 (concluding that there is "special reason" to protect "intimate personal data" connecting an individual to a criminal investigation); Davin, 60 F.3d at 1060 (recognizing "an individual's privacy interest in not having his or her identity revealed in the context of a criminal or national security investigation"). Courts have also found privacy interests to be substantial when disclosure of information might result in harassment or retaliation. For example, in U.S. Department of State v. Ray, the Supreme Court protected from disclosure the names of Haitian nationals who had cooperated in a State Department investigation, in part because disclosure of the names might have subjected the individuals to embarrassment in their communities and could even have resulted in prosecution or other retaliatory efforts by the Haitian government. 502 U.S. at 176; see also Manna v. U.S. Dep't of Justice, 51 F.3d 1158, 1166 (3d

Cir. 1995) ("Releasing the names of the people who assisted in the apprehension of organized crime participants would make the assistors unnecessarily vulnerable to possible harassment and retaliation."). Information traditionally viewed as "highly personal," such as marital and employment statuses, social security numbers, or medical records, has also generally been found to implicate substantial privacy interests. See Ray, 502 U.S. at 175; McDonnell v. United States, 4 F.3d 1227, 1253 (3d Cir. 1993) ("It is beyond dispute that an individual has a substantial privacy interest in his or her medical records.").

But, at least in this circuit, those general principles are not treated as per se rules barring disclosure of particular types of information. The Third Circuit has repeatedly declined to hold that, as a general matter, invasion of certain privacy interests can never be warranted, instead requiring case-specific determinations. In Lame v. U.S. Department of Justice, for example, the Third Circuit expressly declined to adopt a per se rule that "the mere connection of an individual with a criminal investigation[] constitutes an unwarranted invasion of his privacy." 654 F.2d 917, 923 n.6 (3d Cir. 1981); see also Davin, 60 F.3d at 1060 ("While we believe that in the usual circumstance, an individual's privacy interest in not having his or her identity revealed in the context of a criminal or national security investigation overrides the public benefit, we

will refrain from [adopting] a per se rule."). Similarly, the Supreme Court has emphasized that disclosure of names of private individuals is not always or inherently "a significant threat to the privacy of the individuals." Ray, 502 U.S. at 176 n.12. Rather, whether disclosure constitutes a "significant or a de minimus threat" depends upon the context in which the names are found and the potential consequences of disclosure. Id.

The Government contends that the privacy interests implicated by the disclosure of the name in the DeLoach Memorandum are substantial. It asserts that disclosure of the redacted name would reveal a private citizen's association with an FBI background investigation. Defs.' Suppl. Mot. Summ. J. 2-3. That association could be considered embarrassing, the Government suggests, because it might lead to "speculation" of the sort suggested by Plaintiff – namely, that the FBI knew of some sexual impropriety between the named individual and Justice Fortas. Id. at 2; see also Tr. Ex Parte Hr'g 4. The Government further suggests that disclosure of the name "could lead to the conclusion" that the individual was somehow "involved in what appears to be quite inappropriate conduct by the FBI and by a [sitting Supreme Court] [J]ustice." Tr. Ex Parte Hr'g 4. Put more simply, the Government asserts that disclosure would reveal a private citizen's involvement in a sensitive matter that

30

included an FBI background investigation, and thus that there is a substantial privacy interest at stake.

When the DeLoach Memorandum is read in its unredacted form, however, the potential embarrassment described by the Government seems highly speculative, at best. The DeLoach Memorandum itself makes no reference to an FBI background investigation. Without the additional information supplied by the FBI, a reader of the DeLoach Memorandum would be aware only that DeLoach and Justice Fortas had discussed information about George Hamilton, not that the FBI had conducted a background investigation of him. Further, even if it were apparent from the Memorandum that the FBI had investigated Hamilton, there is no suggestion that the investigation was the sort of "criminal or national security investigation" likely to implicate substantial privacy interests. Indeed, the Government admitted at the <u>ex parte</u> hearing that the investigation of George Hamilton was not connected to any criminal investigation or security concern. <u>Id.</u> at 8 (Court: "[W]as George Hamilton really the subject of a criminal or a national security investigation? Mr. Bernstein: No, not to my knowledge.").[7]

---

[7]    This case is therefore unlike <u>Fitzgibbon v. CIA</u>, a D.C. Circuit case upon which the Government heavily relies. In that case, the court of appeals reversed the district court's conclusion that the "bare fact that an individual's name appears in an FBI report . . . is not sufficiently injurious of his privacy to overcome [the] FOIA's presumption in favor of

Nor does the DeLoach Memorandum suggest that Hamilton himself was involved in any illegal or unethical conduct or other impropriety. Although Plaintiff speculates that the redacted name refers to an individual with whom Justice Fortas may have had an improper, possibly sexual, relationship, disclosure of the actual name, in fact, dispels that suspicion.[8] As the Government stated at the <u>ex parte</u> hearing, the DeLoach Memorandum reveals possibly inappropriate conduct by the FBI and by Justice Fortas, but not by George Hamilton, and a reader of the unredacted DeLoach Memorandum does not "learn a lot about [the Hamilton matter] from that [document] alone." <u>Id.</u> at 16. Thus, disclosure of the redacted name – detached from the rest of the Withheld File – does not directly implicate George Hamilton in any unethical, sensitive, or embarrassing conduct; at most, Hamilton is merely a conduit through which to view

---

disclosure." 911 F.2d 755, 767 (D.C. Cir. 1990). The court of appeals reasoned that "the mention of an individual's name in a law enforcement file" – especially when detached from any other information – "will engender comment and speculation and carries a stigmatizing connotation." <u>Id.</u> The court also emphasized an individual's "strong interest . . . in not being associated unwarrantedly with alleged criminal activity." <u>Id.</u> Here, there is no indication that the DeLoach Memorandum is connected to any "alleged criminal activity." Therefore, in addition to being non-binding, the <u>Fitzgibbon</u> decision is distinguishable from this case.

[8]     It seems highly unlikely – if not preposterous – that DeLoach was discussing George Hamilton with Justice Fortas not because of Hamilton's relationship with Lynda Bird Johnson, but because of Hamilton's relationship with <u>Fortas</u>.

improper conduct by the FBI, Justice Fortas, and, potentially, President Johnson.

In addition to the indirect nature of any negative associations revealed by disclosure, there are several other circumstances present in this case that further diminish the significance of the privacy interests at stake. First, a significant amount of time has passed since the events documented in the DeLoach Memorandum occurred. Although it is certainly true that the "[p]assage of time alone is not enough to erase" an individual's privacy interests, those interests "may become diluted" over time. Manna, 51 F.3d at 1166. For that reason, courts should determine the impact of the passage of time by assessing whether "the potential for embarrassment and harassment" continues to endure. McDonnell, 4 F.3d at 1256.

Here, almost fifty years have passed since the DeLoach Memorandum was written. In that intervening time, George Hamilton and Lynda Bird Johnson have moved on with their private lives and married other people, and DeLoach, Fortas, and President Johnson have all passed away. Furthermore, countless accounts have been published about the inner workings of Hoover's FBI, many of which discuss the agency's willingness to investigate high-profile individuals for unsubstantiated, improper, or personal reasons unconnected to the mission of the

FBI.[9] The mere presence of Hamilton's name in an FBI document is therefore unlikely – standing alone – to engender speculation that he was suspected of any criminal conduct. In light of all of those circumstances, it is difficult to see how it would be particularly embarrassing to George Hamilton for the FBI to disclose that he was the subject of a conversation between Justice Fortas and Cartha DeLoach back in 1966.

Second, the specific information protected by nondisclosure is already largely publicly available. In 1995, Cartha DeLoach published a memoir in which he describes in detail the FBI's investigation of George Hamilton and Fortas's role in that investigation. See Cartha D. DeLoach, Hoover's FBI: The Inside Story by Hoover's Trusted Lieutenant (1995). DeLoach writes:

> When Lynda Bird became involved with actor George Hamilton, Johnson became an anxious father. To him, Hamilton seemed no more than a slick opportunist, an upstart taking advantage of his movie fame to charm the daughter of a rich and powerful man. Washington was alive with stories about the couple, and the president knew he had a problem – and one of the ways he solved problems was to call in the FBI.

---

[9]     See, e.g., Matthew Cecil, Hoover's FBI and the Fourth Estate: The Campaign to Control the Press and the Bureau's Image (2014); Douglas M. Charles, The FBI's Obscene File: J. Edgar Hoover and the Bureau's Crusade Against Smut (2012); Ronald Kessler, The Bureau: The Secret History of the FBI (2003).

Id. at 392-93. According to DeLoach, President Johnson called DeLoach and told him "to go up and see Abe Fortas." Id. at 393. Johnson tasked the two of them with "com[ing] up with a way to stop George Hamilton from seeing Lynda Bird." Id. DeLoach explains that he was surprised by the request, as Fortas was already a Supreme Court Justice at the time, but apparently, "as far as the president was concerned, Fortas's seat on the Supreme Court didn't preclude him from doing a little moonlighting for the president." Id. Together, Fortas and Deloach supposedly arranged for the FBI to "run a very discreet check on Hamilton to see if anything turned up." Id. DeLoach describes how the "fishing expedition" did not reveal any incriminating information, but that the couple soon parted ways of their own accord. Id.

It is true that, as the Government argued at the ex parte hearing, "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." Reporters Comm., 489 U.S. at 770 (internal quotation marks omitted); see also Sheet Metal Workers Int'l Ass'n, Local Union No. 19 v. U.S. Dep't of Veterans Affairs, 135 F.3d 891, 905 (3d Cir. 1998) ("[W]e find unconvincing the union's argument that employees have waived their privacy rights because their addresses are available from other public sources and are posted publicly at the job site.").

35

In this day and age, "there are few facts that are not at one time or another divulged to another." Reporters Comm., 489 U.S. at 763. In light of that reality, the Supreme Court has made clear that prior disclosure of a piece of information does not automatically terminate the subject individual's privacy interest in nondisclosure. Id. at 763-64.

But to say that prior disclosure of information does not automatically terminate privacy interests is not to suggest that prior disclosure is irrelevant to the inquiry. On the contrary, the extent to which a fact is already public affects the significance of the privacy rights at stake. See id. at 763 (recognizing that "the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact and the extent to which the passage of time rendered it private"). Simply put, one cannot be said to have "disclosed" a fact which is already known. As the Third Circuit explained in Lame, evidence that information has previously been released publicly "may indicate that the individual's privacy interest is substantially less compelling than might otherwise be assumed." 654 F.2d at 923. The Supreme Court has made similar statements, explaining in Reporters Committee that information can be considered "private" only if it is "not freely available to the public." 489 U.S. at 764.

36

In this case, the specific information that the FBI seeks
to protect – namely, that Justice Fortas and the FBI
collaborated to investigate George Hamilton – has been published
in a book that is publicly available. In fact, Plaintiff himself
cites to DeLoach's memoir in his submissions to the Court,
suggesting that he may be already aware of the information.
Although DeLoach's memoir may not have been widely read, it is
readily available via libraries and bookstores to any member of
the public (indeed, the Court obtained a copy without any
difficulty from a local library). Given that the relevant
inquiry is whether the information is "freely available" – not
whether it is widely known – the information redacted in the
DeLoach Memorandum cannot be said to still be truly "private."

Even more significantly, George Hamilton himself has
written publicly about some of the events at issue in this case.
Hamilton wrote in his own memoir, published in 2008, that, "[a]s
the putative LBJ son-in-law, [he] was subject to incredible
scrutiny." George Hamilton & William Stadiem, Don't Mind If I Do
198 (2008). That scrutiny included a focus by the Johnson
administration on allegations of Hamilton's connections to
homosexual activity. Hamilton writes that his brother, Bill, was
gay, and that "'gay' was the dirtiest word anyone could have
used in and around the Johnson White House." Id. at 201.
According to Hamilton, "[a]s far as homosexual scandals were

37

concerned, the legal doctrine of 'fruit of the poisoned tree' often applied, fair or not," meaning that, "[i]f Bill were outed, [Hamilton] would be inevitably tarred" with the "homosexual" label as well. Id. at 202. Hamilton says that he "didn't want [his] family dragged into the mud," and that his relationship with Lynda Bird Johnson ended shortly after Hamilton became aware of that scrutiny. Id.

Although Hamilton never mentions an FBI investigation, it is clear from his memoir that he knew that his sexuality and other personal information were under scrutiny by the White House. More importantly, he was willing to disclose those facts to the general public in his own memoir, suggesting that – at least at this point in time – he does not retain an "interest in avoiding disclosure" of the fact that the Johnson Administration pursued allegations of homosexuality in his family. Reporters Comm., 489 U.S. at 762.

Under the circumstances of this case, the privacy interests implicated by disclosure of the redacted name are therefore substantially diminished. Although George Hamilton certainly has some interest in "controlling the dissemination" of the fact that he was the subject of a conversation between the FBI and Justice Fortas, see U.S. Dep't of Defense, 510 U.S. at 500, that information is not particularly sensitive or embarrassing, involves events that occurred long ago, and has

been revealed previously in a book that is available to the general public. Furthermore, Hamilton himself has displayed a willingness to publicly discuss the Johnson Administration's scrutiny of his family's private lives, including allegations of homosexuality. Accordingly, Hamilton's interest in avoiding disclosure of the specific information in the DeLoach Memorandum (which, as discussed above, tells the reader very little about Hamilton himself) is minimal, at best.

### b.   Public Interest

Having determined the nature of the privacy interests at stake, the Court now turns to the question of whether there is a public interest served by disclosure. The Supreme Court has made clear that "the only relevant 'public interest in disclosure'" that a court can consider "is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of the operations or activities of the government.'" U.S. Dep't of Defense, 510 U.S. at 495 (quoting Reporters Comm., 489 U.S. at 775) (alteration in original). As Reporters Committee explains, the FOIA reflects the longstanding American principle "that a democracy cannot function unless the people are permitted to know what their government is up to." 489 U.S. at 773 (emphasis in original). The statute's basic purpose is to uphold that principle by requiring agency disclosure. Id. Disclosure of

"[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose," but, generally speaking, "disclosure of information about private citizens that is accumulated in various governmental files" does not. Id. Courts therefore must determine whether an invasion of personal privacy is warranted by considering the degree to which disclosure would shed light on the government's activities, not on the activities of private citizens, even if the activities of private citizens could legitimately be said to attract "public interest." Id. at 774.

As numerous courts have recognized, there is a substantial public interest in information that exposes improper conduct by a government agency. In Davin, for example, the Third Circuit agreed that there is "a strong public interest in illuminating the government's operations and exposing possible misconduct with regard to [an] FBI[] investigation." 60 F.3d at 1059; cf. Prudential Locations LLC v. U.S. Dep't of Housing & Urban Dev., 739 F.3d 424, 433 (9th Cir. 2013) (explaining that revealing the identity of a private individual was unwarranted under the circumstances, in part because there was no evidence that the agency performed the investigations "improperly or inefficiently"). Similarly, because of the substantial public interest "in shedding light on improper Agency conduct," the Fourth Circuit has permitted the disclosure of names of

40

individuals involved in a racial profiling investigation. Casa de Maryland, Inc. v. U.S. Dep't of Homeland Sec., 409 F. App'x 697, 700 (4th Cir. 2011). As the District Court for the District of Columbia put it, when "hindsight and history" indicate that an agency's justification for an investigation was "at best precarious in nature," the public has a "heighten[ed]" interest "in knowing why and against whom the FBI undertook the investigations and tactics that it did." Campbell v. U.S. Dep't of Justice, 193 F. Supp. 2d 29, 41 (D.D.C. 2001).

The Supreme Court has also stated that the public has an interest in information showing "that responsible officials acted negligently or otherwise improperly in the performance of their duties." Favish, 541 U.S. at 174. The Court emphasized, however, that it is insufficient for a FOIA requester to simply assert that public interest without any indication that the agency actually acted improperly. Rather, in order to avoid "transform[ing] Exemption 7(C) into nothing more than a rule of pleading," the Supreme Court stated that a requester asserting a public interest in exposing agency misconduct is required to "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Id.

The Government contends in its motions for summary judgment that disclosure of the redacted name would not further

the public's interest in shedding light on the operations and activities of the government. Mem. Supp. Defs.' Suppl. Mot. Summ. J. 2. It focuses on the particular theory underlying Plaintiff's asserted public interest in disclosure, which is that disclosure of the name could reveal that the FBI was essentially blackmailing Justice Fortas into providing information about the Black case. The Government contends that Plaintiff's blackmail theory is erroneous, and it implies that, as a result, disclosure of the redacted name will not reveal anything about the operations of the FBI. Id. at 4.

Having had the benefit of the in camera review, the Court agrees with the Government that the redacted name and the Supreme Court's handling of the Black case were likely two unrelated subjects that Fortas and DeLoach happened to discuss in the same conversation. Plaintiff's theory hinges on the assumption that the redacted name demotes an individual with whom Justice Fortas had some sort of improper relationship, as only then would the DeLoach Memorandum seem to reflect an effort to intimidate Justice Fortas into the unethical disclosure of information about the Black case. As discussed above, the actual name dispels that assumption, as it seems exceedingly unlikely that Justice Fortas and George Hamilton had any relationship, much less an improper one. Rather, when the unredacted DeLoach Memorandum is read in context with the Withheld File, it is

42

apparent that Justice Fortas and DeLoach were discussing Hamilton as part of the FBI's investigation of Hamilton, and that the Black case was simply an additional topic they happened to discuss at the same time. Thus, Plaintiff's blackmail theory is almost certainly incorrect.

It does not follow, however, that, because the premise upon which the FOIA request was made is incorrect, disclosure of the redacted name serves no public interest. As the Government acknowledged during the ex parte hearing, the unredacted DeLoach Memorandum "implicates . . . inappropriate conduct . . . possibly by the FBI, possibly by Justice Fortas, possibly by both." Tr. Ex Parte Hr'g 15-16. In particular, it reveals that senior FBI officials and a sitting Supreme Court Justice were involved in the investigation of the private life of an individual based upon the personal concern of the President. As the Government put it, such a situation is "highly unconventional," id. at 10, and it suggests a potentially illegal use of executive power, as well as an unusual (and likely improper) collaboration between two branches of government. Disclosure of the redacted name therefore serves the public interest, as it sheds light on the manner in which the FBI performed its duties and substantially contributes to the public's understanding of how the government functioned at the time. See Reporters Comm., 489 U.S. at 773; Davin, 60 F.3d at

43

1059. In fact, the Government essentially admitted as much at the ex parte hearing, stating: "[I]t is hard for me to stand here and deny that there is a public interest" in such information generally. Tr. Ex Parte Hr'g 12; see also id. ("So, yes, at some level, Your Honor, I would not dispute that.").[10]

Furthermore, although Plaintiff's particular blackmail theory is not substantiated by disclosure, Plaintiff identifies several features of the publicly available record that are indicative of the misconduct ultimately revealed by disclosure. For instance, Plaintiff describes how the Memorandum itself notes that it is an "'informal' type memorandum and the contents should be maintained in strict confidence." Pl.'s Renewed Mot. Summ. J. 7 (quoting DeLoach Mem. 2). Plaintiff contends that "[s]uch a statement suggests wrongdoing or serious impropriety on DeLoach's part." Id. Plaintiff also notes that, although the FBI asserts that the redacted name was the subject of a background investigation ordered by the White House, the agency "fails to explain why a security background investigation

---

[10]     The Court appreciates and thanks Government counsel for the thorough and fair presentation of the facts supporting the Government's position. Mr. Bernstein's advocacy was in the highest tradition of the U.S. Department of Justice. See Berger v. United States, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it shall win a case, but that justice shall be done.").

ordered by the White House would involve the improper interaction memorialized in the DeLoach Memorandum." Id. at 9. Plaintiff continues: "Common sense would suggest that the FBI should have, if anything, been soliciting information on the subject from Justice Fortas, rather than furnishing him with sensitive information about the redacted matter." Id. Finally, Plaintiff asserts that the Withheld File is located in "FBI main file 62," which "is denominated as 'miscellaneous'" and includes "documents relating to investigations into unpopular political groups." Id. at 11. Plaintiff questions why, if the Withheld File is a routine background investigative file like the Government suggests, the file was not located in one of the FBI main files designated for such investigations, such as the files for administrative matters, for special inquiries for the White House, or for the security clearance investigation program. Id.

As the in camera review reveals, all of those features of the DeLoach Memorandum are reflective of the "highly unconventional" nature of the investigation at issue. By pointing out those features, and by presenting the Court with substantial external evidence of similar improper conduct by DeLoach and the Hoover FBI, Plaintiff has demonstrated that the allegation of improper conduct by the FBI is "more than a bare suspicion." See Favish, 541 U.S. at 174 (holding that, when "the public interest being asserted is to show that responsible

45

officials acted negligently or otherwise improperly in the
performance of their duties, the requester must establish more
than a bare suspicion in order to obtain disclosure"). Indeed,
despite the factual imbalance inherent in FOIA litigation
generally, Plaintiff has succeeded here in "produc[ing] evidence
that would warrant a belief by a reasonable person that the
alleged Government impropriety might have occurred." Id.; see
also Manna, 51 F.3d at 1166 (concluding that some evidence of
the alleged misconduct "is needed to justify invading the
demonstrable privacy interests involved"). He has therefore
satisfied his burden of demonstrating a public interest in
disclosure.

        In sum, Plaintiff has produced evidence of potentially
improper conduct by the FBI; the in camera review has confirmed
that disclosure exposes likely illegal or unethical conduct by
at a minimum DeLoach and Justice Fortas; and the Government has
conceded that there is a public interest served by disclosure.
Therefore, the Court concludes that disclosure serves a "strong
public interest" because it "illuminat[es] the government's
operations and expos[es] possible misconduct with regard . . .
to [an] FBI[] investigation" – two functions that go to the core
purpose of the FOIA. See Davin, 60 F.3d at 1059; see also U.S.
Dep't of Defense, 510 U.S. at 495.

c.    <u>Balancing the Interests</u>

The final step in the inquiry is to determine, based on the particular interests at stake, whether the invasion of personal privacy posed by disclosure is "clearly unwarranted" by the public interest served by disclosure. As explained above, the privacy interests at stake in this case are substantially diminished, which means that they can easily be overridden by the public's interest in disclosure. Moreover, the public interest served by disclosure of the redacted name is significant, as disclosure reveals an unusual and potentially illegal or unethical collaboration between a sitting Supreme Court Justice and the FBI in the investigation of a private citizen on behalf of the President. Put simply, disclosure of the redacted name tells the public few personal details about the named individual, but reveals a great deal about the functioning of the Hoover FBI during the Johnson presidency. In such a situation, the threat to privacy posed by disclosure cannot be said to be "clearly unwarranted." <u>See</u> <u>Dep't of Air Force v. Rose</u>, 425 U.S. at 380 n.19 (1976) ("Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities."). Exemption 6 therefore does not provide a proper basis for the redactions in the DeLoach Memorandum.

2.  <u>Exemption 7(C)</u>

In addition to Exemption 6, the Government also asserts that nondisclosure of the redacted name is appropriate under Exemption 7(C). That exemption covers "records or information compiled for law enforcement purposes," to the extent that production of those records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Therefore, like Exemption 6, Exemption 7(C) presents a threshold question regarding the substantive coverage of the exemption – namely, whether the information at issue was "compiled for law enforcement purposes." If the information was compiled for such purposes, the court then proceeds to balance the public interest served by disclosure against the privacy interests protected by the exemption.

The Third Circuit has adopted a "rational nexus test" for determining whether information was "compiled for law enforcement purposes." <u>Davin</u>, 60 F.3d at 1056. Under that two-part test, the government must first identify a relationship between the requested documents and a "legitimate law enforcement concern." <u>Abdelfattah v. U.S. Dep't of Homeland Sec.</u>, 488 F.3d 178, 185 (3d Cir. 2007). Then, the government must demonstrate that the asserted relationship "is based upon information sufficient to support at least a colorable claim of the relationship's rationality." <u>Id.</u> at 186. The burden is

48

therefore on the agency to affirmatively demonstrate a "rational nexus" between "its law enforcement authority and the information contained in the withheld material." Id.; see also Davin, 60 F.3d at 1056 (concluding that the FBI "failed to meet its burden" because the evidence submitted did not "provide any detail concerning the supposed law enforcement activities that generated each of the documents"). The court will not "extrapolate" a law enforcement purpose from agency submissions that lack sufficient detail on their own. Abdelfattah, 488 F.3d at 186.

The Government argues that Exemption 7(C) is applicable to the redactions in the DeLoach Memorandum because the Memorandum was part of the FBI's background investigation of George Hamilton. That investigation had a "legitimate law enforcement purpose," the Government contends, because "[t]he investigation was of someone who was in the proximity of the president and [was] developing an intimate relationship with one of [the president's] children." Tr. Ex Parte Hr'g 12. Because of Hamilton's proximity to the President's family, the Government asserts that the FBI's investigation of him was "incident to the protection of the president," which it says is a "legitimate law enforcement activity." Id. at 13; see also id. at 26 ("[W]e take the position that investigating someone who is potentially in an intimate relationship with the child of the president is a

legitimate inquiry."). In support of that proposition, the Government cites to 28 U.S.C. § 533(2), which provides that the Attorney General may appoint officials "to assist in the protection of the person of the President." 2nd Hardy Decl. ¶ 8.

Closely scrutinized, however, that argument is flawed in several respects. First, under the "rational nexus test," it is insufficient for an agency to justify an investigation by merely citing to a legal authority for such investigations generally. As the Third Circuit explained in Davin, in order for a record to fall within Exemption 7, the agency action that produced the record must be connected "to a potential violation of law or security risk." 60 F.3d at 1056. It is not enough for an agency to "cite to the criminal statutes, executive orders, and public laws pursuant to which the investigations were undertaken." Id. Rather, the agency "must establish that its investigatory activities [were] realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached." Id. at 1055 (quoting Pratt v. Webster, 673 F.2d 408, 421 (D.C. Cir. 1982)). Put simply, even if statutorily authorized, an investigation does not constitute a "legitimate law enforcement activity" unless it is related to

a "possible security risk or violation of federal law."[11] Id. at 1056.

That is so even when the agency at issue is a "law enforcement agency," such as the FBI. See id. at 1054. In this circuit, there is no presumption that investigations undertaken by the FBI pursuant to its statutory authority serve a legitimate law enforcement function. Indeed, in the Davin decision, the Third Circuit expressly declined to adopt a per se rule that records compiled by the FBI qualify as "records compiled for law enforcement purposes." Id. Instead, the court agreed with the D.C. Circuit's decision in Pratt v. Webster, which held that even law enforcement agencies like the FBI must identify a possible security risk or violation of federal law in order to show "that the agency acted within its principal function of law enforcement, rather than merely engaging in a general monitoring of private individuals' activities." Id.

---

[11] The Third Circuit's later decision in Abdelfattah cabined certain aspects of the Davin opinion. In particular, Abdelfattah clarified that, contrary to language included in dicta in Davin, "an agency seeking to invoke Exemption 7 does not have to identify a particular individual or incident as the object of an investigation into a potential violation of law or security risk." 488 F.3d at 185. But Abdelfattah reiterated the aspects of the Davin decision referenced above, specifically emphasizing "that Exemption 7 still requires an agency to demonstrate that the relationship between its authority to enforce a statute or regulation and the activity giving rise to the requested documents is based upon information sufficient to support at least a colorable claim of the relationship's rationality." Id. at 186.

(quoting Pratt, 673 F.2d at 420). As the Pratt Court explained, the phrase "law enforcement purpose" in Exemption 7 "was not meant to include investigatory activities wholly unrelated to law enforcement agencies' legislated functions of preventing risks to the national security and violations of the criminal laws and of apprehending those who do violate the laws." Pratt, 673 F.2d at 420-21.

The particular facts at issue in Davin are instructive. In that case, the FOIA requester sought all FBI records pertaining to the Workers Alliance of America ("WAA") and its former head, David Lassler (who had provided a letter authorizing release of his files). 60 F.3d at 1046. The FBI disclosed some records, but it withheld thousands of documents compiled during the its investigation of the WAA and Lassler. Id. The FBI's investigation (or, more accurately, series of investigations) began in the 1930s to explore allegations that the WAA was a front for the Communist Party of America. Id. The FBI justified withholding documents connected with that investigation by generally describing the files related to the inquiry and citing several legal authorities for its investigation, including statutes criminalizing treason and espionage, as well as executive orders addressing security and loyalty investigations of government employees. Id. at 1046-47.

The Third Circuit considered reliance upon these facts inadequate to satisfy the agency's burden under Exemption 7. While acknowledging that the references to legal authorities were presumably intended to suggest "that somewhere within the parameters of these general provisions were criminal acts that the FBI suspected [Lassler and the WAA] of committing," the court concluded "that the simple recitation of statutes, orders and public laws is an insufficient showing of a rational nexus to a legitimate law enforcement concern." Id. at 1056 (quoting King v. Dep't of Justice, 830 F.2d 210, 230 (D.C. Cir. 1987)) (alteration in original). The court noted that the FBI's investigations spanned more than forty years, and yet the government had "not pointed to a single arrest, indictment or conviction." Id. Although an indictment is not necessary for the government to sustain its burden, the court explained that, on that record, "the government must allege additional specific facts that demonstrate 'the agency was gathering information with the good faith belief that the subject may violate or has violated federal law,' and was not 'merely monitoring the subject for purposes unrelated to enforcement of the law.'" Id. at 1056-57 (quoting Lamont v. Dep't of Justice, 475 F. Supp. 761, 773 (S.D.N.Y. 1979)).

Here, the Government's basic contention is that, pursuant to its statutory authority to assist in the protection of the

president, the FBI is permitted to investigate private
individuals who will be in close proximity to the president, and
thus the instant investigation – which undeniably targeted a
person who would have been in close proximity to President
Johnson – must be a "legitimate inquiry" protected by Exemption
7. But that argument is essentially circular. As Davin makes
clear, the fact that there is statutory authorization for an
agency investigation does not necessarily mean that the
investigation was part of a legitimate law enforcement activity.
In other words, it is possible for the FBI to have the authority
to investigate private citizens who will be in close proximity
to the president, but for the actual investigation the agency
conducted to be unrelated to a "legitimate law enforcement
concern." See Abdelfattah, 488 F.3d at 185. The Government's
citation to its statutory authority "to assist in the protection
of the person of the President" is therefore inadequate,
standing alone, to establish a "rational nexus" between the
FBI's "law enforcement authority and the information contained
in the withheld material." Id. at 186.

Moreover, the record in this case strongly suggests that
the FBI's investigation of George Hamilton was not actually
"based on a legitimate concern that federal laws have been or
may be violated or that national security may be breached." See
Davin, 60 F.3d at 1055. The Government does not assert that

54

Hamilton was suspected of having violated a federal law, nor
does it contend that his investigation was in any way associated
with criminal allegations. Rather, the Government argues that
the purpose of the investigation was to assist in the protection
of the President and his family, implicitly asserting that
Hamilton posed a security risk.[12] But there is nothing in
Hamilton's investigative file that suggests he was viewed as a
security threat or that the FBI believed he posed a danger to
President Johnson. To the contrary, the file indicates that the
agency investigated Hamilton either out of parental concern
about his "character" or because of the perceived political
threat he posed to President Johnson – namely, the risk of
scandal created by any association with homosexuality and the
potential for embarrassment to the President. Regardless of

---

[12]     In noting the FBI's implicit assertion that Hamilton
posed a security risk, the Court does not suggest that an
individual must pose a demonstrable security risk in order for
the FBI to have statutory authorization to investigate that
person incident to its authority to "to assist in the protection
of the person of the President." Rather, the Court notes the
implicit assertion because it is the only means by which the FBI
attempts to establish a legitimate law enforcement concern
underpinning its investigation. The issue in this case is not
whether the FBI's actions were <u>legal</u>, it is whether the actions
were related to a "legitimate law enforcement activity." As
explained above, a "legitimate law enforcement activity" must be
related to a "possible security risk or violation of federal
law." <u>Davin</u>, 60 F.3d at 1056. Because the Government does not
contend that Hamilton's investigation was based upon a possible
violation of federal law, the investigation <u>must</u> have been based
upon a "possible security risk" in order to trigger the
protections of Exemption 7(C).

motive, the file can be read as an effort by the FBI to uncover embarrassing details about a private citizen as a personal favor to the President. In fact, the Government repeatedly conceded those facts during the ex parte hearing, stating that the purpose of the investigation was "a parental interest on Johnson's behalf," Tr. Ex Parte Hr'g 6, agreeing that Hamilton was never "the subject of a criminal or a national security investigation," id. at 8, acknowledging that the Withheld File "seems to be more like digging up dirt on Mr. Hamilton" than conducting a security investigation, id. at 12-13, and even admitting that review of the Withheld File does not reveal "anything that suggested a danger to President Johnson," id. at 14. In light of those facts, the Government's current position that the investigation was for "protection of the person of the president" seems to be merely a post-hoc rationalization of the agency's conduct rather than the genuine motive for the FBI's investigation.

Based on that record, the Court concludes that the FBI has not met its burden of demonstrating a "rational nexus" between "its law enforcement authority and the information contained in the withheld material." Abdelfattah, 488 F.3d at 186. Quite the contrary; this case presents precisely the kind of situation that inspired the adoption of the "rational nexus" test to begin with. By placing the burden on the agency to

demonstrate a rational relationship between the withheld information and a legitimate law enforcement concern, the Third Circuit has attempted to differentiate between FBI investigations that are based upon genuine concerns about national security or criminal conduct, and pretextual investigations that constitute "general monitoring of private individuals' activities." See Davin, 60 F.3d at 1054 (quoting Pratt, 673 F.2d at 420). Here, the FBI has asserted a statutory basis for its investigation that could be indicative of a legitimate law enforcement concern, but the evidence in this case shows just the opposite, revealing that the White House enlisted the FBI to conduct a personal inquiry into a private individual's background without any suggestion of a security threat. That evidence is insufficient to satisfy the threshold inquiry of Exemption 7(C), as it does not show a rational relationship between the withheld information and a "legitimate law enforcement concern." See Abdelfattah, 488 F.3d at 185.

When a record does not satisfy the threshold requirement of Exemption 7(C), the court need not consider whether production of that record "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Nonetheless, for the sake of completeness, the Court notes that the Government would fail at that stage of the inquiry as well. As mentioned above, the

57

interests weighed in the balancing test of Exemption 7(C) are identical to those weighed in Exemption 6; the tests differ only "in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions." U.S. Dep't of Defense, 510 U.S. at 496 n.6. Specifically, for a record to be withheld under Exemption 6, disclosure must "constitute a <u>clearly unwarranted</u> invasion of personal privacy," whereas records can be withheld under Exemption 7(C) if disclosure "could <u>reasonably be expected</u> to constitute an <u>unwarranted</u> invasion of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C) (emphasis added). Exemption 7(C) therefore "provides greater protection from disclosure than [E]xemption 6." <u>Sheet Metal Workers</u>, 135 F.3d at 898; <u>see also</u> <u>Reporters Comm.</u>, 489 U.S. at 756 ("[T]he standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files.").

For the reasons explained above with regard to Exemption 6, the privacy interests in the redacted name are substantially diminished, and the public interest served by disclosure is significant. More specifically, the public's interest in shedding light on the FBI's unconventional collaboration with a sitting Supreme Court Justice in the background investigation of

a private citizen outweighs George Hamilton's limited interest in avoiding disclosure that he was one of the subjects of a conversation between a senior FBI official and Justice Fortas. Under such circumstances, disclosure of the redacted name cannot "reasonably be expected to constitute an unwarranted invasion of personal privacy." See 5 U.S.C. § 552(b)(7)(C). Therefore, recognizing that Exemption 7(C) is more protective than Exemption 6, the Court concludes that disclosure of the redacted name is warranted under either exemption.

      3.   Appropriate Remedy

     The redaction of the fifteen-character name from the DeLoach Memorandum is not appropriate under either of the FOIA exemptions asserted by the Government. Although the name is a "similar" file within the meaning of Exemption 6, disclosure of the name does not "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). As for Exemption 7(C), the Government has not met its burden of demonstrating a rational connection between the withheld information and a legitimate law enforcement concern. See Abdelfattah, 488 F.3d at 186. Moreover, even if the Government had succeeded in making such a showing, disclosure of the redacted name cannot "reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The Court therefore grant Plaintiff's motion for summary judgment on the

FOIA claim in the Original Complaint,[13] deny the Government's supplemental motion for summary judgment, and order the FBI to produce to Plaintiff an unredacted copy of the DeLoach Memorandum.

>    B.   The Withheld File

The Court's next task is to evaluate the cross-motions for summary judgment on the claims in the Supplemental Complaint, which arise from the FBI's handling of Plaintiff's FOIA request for FBI File No. 62-HQ-110654 (the file in which the DeLoach Memorandum is located). Plaintiff submitted his request on October 19, 2012. Pl.'s Mot. Leave File Suppl. Compl.

---

[13]    Plaintiff also brings a claim under the APA based upon the same alleged conduct by the FBI, and seeking the same relief. However, "the APA only allows review where there exists 'no other adequate remedy in a court.'" Ctr. Platte Natural Res. Dist. v. U.S. Dep't of Agric., 643 F.3d 1142, 1148 (8th Cir. 2011) (quoting 5 U.S.C. § 704). When, as here, the FOIA provides an alternate adequate remedy, a plaintiff is precluded from seeking relief directly under the APA's judicial review provisions. 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); see also Rimmer v. Holder, 700 F.3d 246, 262 (6th Cir. 2012) (holding that, because the district court has authority under the FOIA to order "production of the unredacted documents [plaintiff] seeks," the FOIA "clearly provides an alternate adequate remedy in court and thus triggers § 704's bar on claims brought under the APA"); Nat'l Sec. Counselors v. CIA, 898 F. Supp. 2d 233, 264 (D.D.C. 2012) ("[W]here a plaintiff claims that an agency has wrongfully withheld agency records in connection with discrete FOIA requests, an APA claim seeking compelled disclosure of the withheld records is precluded."). Accordingly, the Court will deny Plaintiff's motion for summary judgment to the extent it seeks additional relief under the APA.

Ex. A., FOIA Request, Oct. 19, 2012, ECF No. 21-1. At the time Plaintiff moved to file the Supplemental Complaint eleven months later, the FBI had acknowledged receipt of the request for the file, but had neither "produced any documents responsive to the Request nor denied it." Suppl. Compl. ¶ 4. Once the Supplemental Complaint was filed, the FBI denied Plaintiff's request, explaining in a letter dated December 9, 2013, that, because Plaintiff had "requested the file of a living third party, the entire file and its contents are categorically withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)." 3rd Hardy Decl. Ex. D, FOIA Denial Letter, Dec. 9, 2013.

Plaintiff's Supplemental Complaint, as originally filed, asserts that the FBI violated the FOIA by failing to timely respond to Plaintiff's request.[14] Suppl. Compl. ¶ 11. After the FBI categorically denied the request, the Court granted Plaintiff's motion to add to the Supplemental Complaint an additional FOIA claim arising from the FBI's alleged failure to release reasonably segregable, nonexempt material from the requested file. To resolve the pending cross-motions for summary judgment on the claims in the Supplemental Complaint, the Court must therefore decide two questions: (1) whether the FBI

---

[14]     The Supplemental Complaint also includes a claim under the APA. As explained above, see supra note 13, because the FOIA provides an alternate adequate remedy, Plaintiff is precluded from seeking relief directly under the APA. See 5 U.S.C. § 704.

violated the FOIA by categorically withholding the entire requested file; and (2) if so, what remedy is appropriate.[15]

> 1.   Categorical Denial of the File

The Government contends that the claims in the Supplemental Complaint should be dismissed because background check files of living third party individuals are categorically exempt from disclosure under Exemption 6 and Exemption 7(C). Its basic argument is that, "[w]ithout express authorization and consent from the living third party, proof of death, and/or evidence that the public interest in disclosure outweighs personal privacy interests," disclosure of any of the information in a background investigative file constitutes an "unwarranted invasion of personal privacy." 4th Hardy Decl. ¶ 34. In support of that contention, the Government explains that a background check file "will normally contain personal information such as social security number, date of birth, present and past addresses, financial information, e.g. credit reports, [and] medical history." Mem. Supp. Defs.' 2nd Suppl.

---

[15]      Because the FBI did not respond to Plaintiff's FOIA request within the twenty-day period provided for in the FOIA, Plaintiff is "deemed to have exhausted his administrative remedies," 5 U.S.C. § 552(a)(6)(C)(i), which means the Court has jurisdiction to consider his claims. See Amro v. U.S. Customs Serv., 128 F. Supp. 2d 776, 786 (E.D. Pa. 2001) (Robreno, J.) ("Under FOIA's statutory scheme, when an agency fails to comply in a timely fashion to a proper FOIA request, it may not insist on the exhaustion of administrative remedies . . . ." (quoting Pollack v. Dep't of Justice, 49 F.3d 115, 118 (4th Cir. 1995))).

Mot. Summ. J. 1. The Government also repeats the argument that
the relevant investigation was "a legitimate law enforcement
activity," and it suggests that all of the documents in the
investigative file are therefore subject to Exemption 7(C). In
other words, because of the nature of the information ordinarily
contained within background check files, the FBI contends that
such files can be withheld categorically and in their entirety
under Exemptions 6 and 7(C).

That argument finds no support in the FOIA or in the
relevant case law. As a general matter, the FOIA does not permit
categorical denials of individual documents, much less entire
files. As Plaintiff rightly notes, the FOIA expressly provides
that "[a]ny reasonably segregable portion of a record shall be
provided to any person requesting such record after deletion of
the portions which are exempt." 5 U.S.C. § 552(b). Based upon
that provision, the Third Circuit has concluded that the burden
is on the agency "to demonstrate that it has released all
reasonably segregable portions of each withheld document."
Abdelfattah, 488 F.3d at 186. "An agency cannot justify
withholding an entire document simply by showing that it
contains some exempt material." Id. (quoting Mead Data Cent. v.
U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977))
(internal quotation marks omitted). Nor is it sufficient for the
agency to assert "that documents were withheld because they

63

contain the type of information generally protected by a particular exemption." Davin, 60 F.3d at 1052. Rather, the agency must affirmatively "demonstrate that all reasonably segregable, nonexempt information was released." Abdelfattah, 488 F.3d at 186; see also Dep't of Air Force v. Rose, 425 U.S. at 380-81 (approving of selective redaction of personal details from documents that would otherwise pose a clearly unwarranted threat to personal privacy). The basic premise of the Government's argument – namely, that certain types of files are categorically exempt from disclosure – is therefore incorrect as a matter of law.

Furthermore, neither of the two exemptions asserted by the Government can be said to apply to all of the contents of the particular file at issue in this case. With regard to Exemption 6, it is certainly true that a large amount of the information in the Withheld File implicates the privacy interests of various third parties. As the Government rightly noted at the ex parte hearing, the file includes "page after page after page" of gossip-laden rumors of alleged homosexual behavior by numerous individuals, as well as other allegations that could be viewed as derogatory or embarrassing. See Tr. Ex Parte Hr'g 21. Much, if not all, of that information is likely protected by Exemption 6, as the subject individuals may still retain privacy interests in nondisclosure, and, generally

speaking, the public interest in disclosure of gossip about private citizens is minimal to nonexistent.

But it is also clear that some information in the file is not protected by Exemption 6. For instance, the Government itself admits that most of the DeLoach Memorandum is not exempt from disclosure, and the FBI has previously released a summary of another document in the Withheld File, which addressed possible homosexual activity by the deceased actor Rock Hudson. As the release of those documents shows, there is information in the Withheld File that can be disclosed without causing a "clearly unwarranted invasion of personal privacy." <u>See</u> 5 U.S.C. § 552(b)(6). The Government therefore cannot properly assert Exemption 6 as a basis for its denial of the entire file.[16]

Turning to Exemption 7(C), that exemption also cannot be said to apply to all of the information in the Withheld File. First, for the reasons explained in depth above, the Government

---

[16]     The Government also acknowledged at the <u>ex parte</u> hearing that an adverse ruling with regard to the redacted name would necessitate another review of the Withheld File to evaluate whether any of the other information in the file could be released. <u>See</u> Tr. <u>Ex Parte</u> Hr'g 18. Once the redacted name is made public, the FBI can no longer withhold information solely on the basis that the information might reveal the identity of the named individual. Of course, revealing the identity of that individual does not disclose any details about the nature of the investigation, and so there are certainly still privacy interests at stake. But, as the Government admitted, some of the documents in the Withheld File, such as newspaper clippings retained within the file, may need to be released in light of the Court's ruling with regard to the Redacted Memorandum. <u>Id.</u>

has not met its burden of demonstrating a "rational nexus"
between the instant investigation and a legitimate law
enforcement purpose. As a result, the Government has not
satisfied the threshold Exemption 7 requirement with regard to
any of the documents in the Withheld File, not just the DeLoach
Memorandum. Therefore, absent evidence that some of the
documents in the Withheld File were actually compiled for a
legitimate law enforcement purpose (perhaps by showing that they
relate to a different investigation), Exemption 7 cannot provide
a proper basis for nondisclosure of the information in the
Withheld File.

    Second, even if the overall investigation at issue did
serve a legitimate law enforcement function, the Government
still could not assert Exemption 7(C) as a basis for
categorically denying all of the information in the Withheld
File. In addition to the FOIA's general instruction that
agencies release all reasonably segregable materials, Congress
specifically amended the FOIA to prevent agencies from
categorically withholding entire files under Exemption 7. As the
Supreme Court explained in John Doe Agency v. John Doe Corp.,
Exemption 7 formerly referred to investigatory "files," rather
than "records." 493 U.S. 146, 156 (1989). Based on that
language, the D.C. Circuit "had permitted Exemption 7 to be
applied whenever an agency could show that the document sought

was an investigatory file compiled for law enforcement purposes." Id. Concerned "that agencies would use that rule to commingle otherwise nonexempt materials with exempt materials in a law enforcement investigatory file and claim protection from disclosure for all the contents," Congress changed the word "files" to "records." Id. Thus, in its current form, Exemption 7 requires the agency to demonstrate that a particular record – not just the file in which it is contained – was "compiled for law enforcement purposes." Id.; see also Davin, 60 F.3d at 1059-60 ("[T]here can be no question that the 7(C) balancing test must be conducted with regard to each document, because the privacy interest and the interest of the public in disclosure may vary from document to document. Indeed, these interests may vary from portion to portion of an individual document." (quoting Lame, 654 F.2d at 923)); Campbell, 193 F. Supp. 2d at 38 ("[T]he FBI relied on an untenable position that once an investigation is justified, all documents related to that investigation are eligible for exemption from FOIA.").

In sum, the Government cannot categorically withhold an entire FBI file on the basis that some of the information in the file is likely exempt from disclosure. Rather, after deleting the specific portions of the file that are exempt from disclosure, the FBI is required to release to a FOIA requester any "reasonably segregable portion" of each record contained

within the file. 5 U.S.C. § 552(b). The Government has made no effort to demonstrate that it has fulfilled that obligation. In fact, in its response to Plaintiff's motion for summary judgment, the Government effectively concedes that there is reasonably segregable material in the Withheld File, as it notes the "obvious possibility that any one document may address a number of matters, one or more of which may be subject to a law enforcement activity and privacy exemption, while others may not be." Defs.' Mem. Opp'n Pl.'s 3rd Mot. Summ. J. 3, ECF No. 40. In other words, the Government agrees that there is reasonably segregable, nonexempt material in the Withheld File. The Government's categorical denial of Plaintiff's request for the material in the file is therefore in violation of the FOIA.

     2.   Appropriate Remedy

     Because the categorical denial of Plaintiff's request constitutes a violation of the FOIA, the Government's motion for summary judgment on the claims in the Supplemental Complaint must be denied. For the same reason, Plaintiff is entitled to judgment in his favor on his claim that the FBI violated the FOIA by failing to release reasonably segregable, nonexempt material from the requested file. The Court will therefore deny the Government's motion and grant Plaintiff's motion to the extent it seeks a declaration that the FBI's categorical denial of the requested file was unlawful.

That conclusion does not, however, mean that the Court must order the FBI to produce the requested file. As discussed above, the file is overflowing with gossip, rumor, and third-level hearsay concerning potentially embarrassing allegations and personal details about private citizens, and at least some of that information is likely protected by Exemption 6 (or perhaps by other exemptions). Put simply, much of the information in the file may still be exempt from disclosure, even if not categorically so.[17]

As such, the Court will deny Plaintiff's request for "injunctive relief compelling the FBI to promptly produce the requested material." Suppl. Compl., Request for Relief ¶ 3.

_____

[17]     The Court rejects Plaintiff's invitation to treat the withholding of the file as "spoliation of the evidence." According to Plaintiff, "[b]y withholding file 62-HQ-110654 in its entirety," the FBI has engaged in "concealing evidence," a form of "spoliation of evidence" that Plaintiff says permits the Court "to draw all permissible adverse inferences against the FBI." Pl.'s 3rd Mot. Summ. J. 20. But the "spoliation inference" Plaintiff refers to is an evidentiary rule that has no application here. The need for a spoliation inference arises when a party has destroyed, or has otherwise made unavailable, "evidence relevant to the dispute being litigated." Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994). The rationale for the inference is the "common sense observation" that a party who destroys relevant evidence "is more likely to have been threatened" by that evidence than the opposing party. Id. Here, there has not been any destruction of the evidence; indeed, the Government made the evidence fully available to the Court. Moreover, the Government's failure to disclose the evidence is the crux of the legal issue, and the Government contends it has no legal obligation to disclose any of the information within the file. Plaintiff's evocation of the spoliation inference is therefore inapposite.

Instead, consistent with its broad equitable power under the FOIA, the Court will order the FBI to review the requested file again in light of the Court's ruling and to release to Plaintiff any reasonably segregable, nonexempt material contained within FBI File No. 62-HQ-110654. See 5 U.S.C. § 552(a)(4)(B) (granting district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant"); see also Renegotiation Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 19 (1974) (explaining that the district court's "broad equitable power" under the FOIA is not limited to the specific remedies expressly delineated in the statute).

## V.    CONCLUSION

Although this case ostensibly involves the disclosure of the name of a private citizen, the particular information requested reveals less about that individual than it does about the functioning of the federal government during the 1960s. Ultimately, disclosure of the name in light of the attending circumstances goes to the core purpose of the FOIA: to ensure that our democracy can properly function by allowing the public to know "what their government is up to." Thus, for the reasons expressed above, the Court will deny both of the Government's pending motions for summary judgment in their entirety, and grant both of Plaintiff's pending motions for summary judgment

in part. Specifically, the Court will: (1) grant Plaintiff's request for a declaration that the FBI's failure to provide him with an unredacted version of the DeLoach Memorandum is unlawful; (2) grant Plaintiff's request for an injunction requiring the FBI to promptly provide him with an unredacted version of the DeLoach Memorandum; (3) grant Plaintiff's request for a declaration that the FBI's categorical denial of the FBI File No. 62-HQ-110654 is unlawful; (4) order the FBI to review FBI File No. 62-HQ-110654 again in light of the Court's ruling and to release to Plaintiff any reasonably segregable, nonexempt material contained within the file; (5) deny Plaintiff's request for injunctive relief compelling the FBI to produce the entirety of FBI File No. 62-HQ-110654; and (6) deny both of Plaintiff's motions to the extent they seek relief under the APA.[18] An appropriate order follows.

---

[18]     The Court will also entertain a motion by Plaintiff for reasonable attorney fees, as provided by the FOIA. See 5 U.S.C. § 552(a)(4)(E)(i) ("The Court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.").

**EXHIBIT A**

b6
b7C

10/25/66

Mr. Tolson
Mr. DeLoach
Mr. Mohr
Mr. Wick
Mr. Casper
Mr. Callahan
Mr. Conrad
Mr. Felt
Mr. Gale
Mr. Rosen
Mr. Sullivan
Mr. Tavel
Mr. Trotter
Tele. Room
Miss Holmes
Miss Gandy

MR. TOLSON:

RE:   CONVERSATION WITH JUSTICE FORTAS –
                              MATTER;
      BLACK CASE

          For record purposes, Justice Fortas called
at 10:30 this morning to express appreciation for the
information the Director had me furnish him concerning
the                    matter.  Justice Fortas advised he
agreed with the Director that no further action need
be taken at this time.  He stated he would get in touch
with us in the event further inquiries should be made.
                    WIRETAPPING
          While talking with Justice Fortas, I told him
that perhaps he might consider the question I was about
to ask a little off base; however, we were somewhat
concerned about the Black case.  I asked him if he knew
when a decision would be handed down.  He replied that
there would be a decision probably on Monday a week
(11/7/66).  I asked him if we should prepare for the
worst, inasmuch as he had previously advised me that the
court was considering issuing a sweeping proclamation
denouncing the use of electronic devices.  He told me
the court's thinking had changed somewhat concerning
this matter.

          I asked him what he meant.  He stated the
court's decision would not be definitive.  I asked him what
he meant by that.  He stated the court actually felt that
the Black case and its various problems (meaning the
microphone) should not be handled at Supreme Court level.
I thanked the Justice for his information.  It would seem
that Justice Fortas undoubtedly meant that the Black case
was to be remanded to the lower court.

          Pursuant to the Director's instructions, we are
checking immediately to find out the identity of the judge
who handled this matter in the lower court.  A memorandum
will be sent through on him just as soon as his identity
is ascertained.

                                    62-12114
                              NOT RECORDED
                              126 OCT 31 1966              6   OCT 31 1966
                                    Respectfully,
CDD:CSH
cc Mr. DeLoach                              C. D. DeLoach
   Mr. Gale

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE

ORIGINAL FILED IN 62-110654-37

ADDENDUM

It should be clearly stated that Justice Fortas did not
in any manner give me any information to which I was not entitled.
He did not violate ethics in any manner. The above supposition ---
and that is all it is --- was strictly on my part. On the few
occasions that I have interviewed Justice Fortas, he has never
furnished me "any inside information." Neither have I asked for
such information. This memorandum was written merely because
of the Director's interest in the Black case. This memorandum
is naturally an "informal" type memorandum and the contents should
be maintained in strict confidence.

- 2 -